UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SHAWN W. GAYLOR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 1:06-cv-0194-DFH-TAB |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Shawn W. Gaylor seeks judicial review of a decision by the Commissioner of Social Security denying his claim for disability insurance benefits under the Social Security Act. Acting for the Commissioner, an Administrative Law Judge ("ALJ") determined that Mr. Gaylor suffered from degenerative disc disease and depression but was not disabled under the Act because he retained the residual functional capacity to perform light exertional work with certain physical, mental, and social restrictions. As explained below, the court affirms the ALJ's denial of benefits.

*Background*

Mr. Gaylor was born in 1969 and was 35 years old when the ALJ denied benefits under the Social Security Act. Mr. Gaylor has a high school education

and previously worked as a die caster, package handler, convenience store clerk, and grocery store bagger. In 1996, Mr. Gaylor first injured his back while working at Chrysler. Over the next three years, Mr. Gaylor worked sporadically, but he frequently suffered from severe back pain. Mr. Gaylor stopped working entirely on January 5, 2001, and he claims that he has been entitled to Social Security disability insurance benefits since that date.

I.    *Medical Evidence*

    A.    *Physical Impairment*

On February 4, 1999, Dr. Michael F. Coscia, M.D., a spine and orthopedic surgeon, examined Mr. Gaylor. Dr. Coscia found that a Magnetic Resonance Imaging ("MRI") of Mr. Gaylor's back showed "marked disc dehydration and degenerative change at the L4-5 and L5-S1 levels with small right-sided disc herniations at the L4-5 and the L5-S1 levels and what appears to be an annular tear at the L5-S1 level." R. 394. Dr. Coscia stated that x-rays of the spine revealed mild loss of disc space height at the L4-5 level and moderate loss of disc space height at the L5-S1 level. R. 393. He further noted that various physical movements exacerbated the pain. *Id.* Dr. Coscia diagnosed Mr. Gaylor with "Probable internal disc disruption syndrome at the L4-5 and L5-S1 levels with small accompanying right-sided disc herniations also at each level." R. 394.

Multiple doctors confirmed Mr. Gaylor's back problems based on x-rays, physical exams, MRIs, digital radiographs, and lumbar discographies. These doctors reported variously that Mr. Gaylor suffered from annular tears, bulging/protruding discs, lessening disc height, disc dehydration, compromise of nerve roots, desiccation of discs, arthritis, muscle spasms, degenerative disc disease, post-fusion syndrome, disc disruption syndrome, disc derangement, and disc herniations. R. 211, 218, 383, 397-99, 406, 416, 417, 430, 499.

Mr. Gaylor received numerous treatments, including two surgeries, to correct his back disorders and relieve his pain. On January 18, 2000, Dr. Coscia performed a right L5-S1 hemilaminotomy, foraminotomy, diskectomy, and canal and nerve root decompression on Mr. Gaylor. R. 380. On October 15, 2002, Dr. Coscia performed an anterior and a posterior spinal fusion on discs L4 to L5 and L5 to S1. R. 523, 526. Mr. Gaylor also underwent many less invasive procedures, including epidural injections, intradiscal electrothermal therapy, and a bilateral L5-S1 and L4-5 facet joint nerve block. R. 411, 428, 430, 519. Mr. Gaylor used an RS stimulation device two times a day and took various pain medications several times a day, including Oxycodone, Vicodin, Duragesic, Zonegran, Zanaflex, and Norco. R. 53, 408, 409, 534, 547, 742.

Despite doctors' reports that the surgeries were successful, Mr. Gaylor continued to complain of severe disabling pain, which he reported was unchanged from before the procedures. R. 204, 521, 533, 535, 545. Dr. Coscia reported that

the fusion had made "excellent progression" and that there was "no evidence of complications or problems whatsoever." Dr. Coscia wrote that Mr. Gaylor stated he was walking more than one mile per day yet reported disabling pain. R. 521, 543. Dr. Coscia concluded that Mr. Gaylor was "markedly deconditioned" and needed to be weaned from narcotics. R. 521-22. He reported that "there is nothing more that I would have to offer him," and "I cannot justify long term disability for him and this would need to be done through the psychologist or an expert in chronic pain problems." R. 540, 545-46. Dr. Coscia requested a second opinion from his colleague, Dr. Terry Trammell, M.D., to confirm that Mr. Gaylor should be released to work with permanent restrictions. R. 540.

On June 30, 2003, Dr. Trammell reported that Mr. Gaylor appeared to have a "solid, well-incorporated fusion" but that Mr. Gaylor said he had "not done particularly well" since the spinal fusion and was "continuing to have symptoms of unrelenting back pain as well as pain into both lower extremities." R. 535. Dr. Trammell wrote that Mr. Gaylor had "reached maximum medical improvement and that there is really nothing else that we are going to do for him." R. 538. Trammell noted that on "today's examination [Mr. Gaylor] doesn't seem to be markedly disabled by his complaints of pain." R. 538.

Dr. John R. McLimore, M.D., also examined Mr. Gaylor post-fusion at Dr. Coscia's request. Dr. McLimore wrote that Mr. Gaylor's use of pain medication showed signs of opioid dependency. Dr. McLimore stated that Mr. Gaylor

appeared "more comfortable than his amplified pain score numerically," and referred him to a psychologist for help in weaning from pain medications. Dr. McLimore suggested institutional detoxification if Mr. Gaylor showed further "drug seeking behaviors." R. 547, 550.

In a Disorders of the Spine Questionnaire dated July 8, 2003, Dr. Eric Heathers, M.D., one of Mr. Gaylor's treating physicians, asserted that Mr. Gaylor's back impairment had been confirmed by operative notes and appropriate medically acceptable imaging. R. 494-97. Dr. Heathers stated that Mr. Gaylor had a compromised nerve root or spinal cord and suffered from persistent pain, muscle spasms, limitations of motion of the spine, muscle weakness and sensory loss, but did not have reflex loss, motor loss, or atrophy. He found that Mr. Gaylor's symptoms were consistent with medical findings and would interfere with the ability to maintain reliable attendance in a work setting.

In a Disorders of the Spine Questionnaire dated September 15, 2003, Dr. Green-Mack, another treating doctor, stated that Mr. Gaylor suffered from sensory dysesthesia, which had been confirmed by operative notes and appropriate medically acceptable imaging. R. 563-66. Dr. Green-Mack asserted that Mr. Gaylor suffered from persistent pain and limitations of motion of the spine, despite prescribed therapy. *Id.* She also wrote that these symptoms were consistent with medical findings and would interfere with the ability to maintain reliable attendance in a work setting. *Id.*

On September 16, 2003, Dr. Heathers wrote that he had seen Mr. Gaylor approximately 36 times since February 1998 for chronic low back pain, that Mr. Gaylor had not improved, and that at best Mr. Gaylor would be able to work only three days per week, regardless of restrictions. R. 567.

  B. *Mental Impairment*

Dr. Carl G. Madsen, M.D., reported in a consulting Report of Psychiatric Status dated March 29, 2000 that Mr. Gaylor suffered from dysthymic disorder, panic attacks with agoraphobia, and major depression. R. 289. Dr. Madsen noted that Mr. Gaylor experienced "difficulty maintaining concentration on either vocational or recreational tasks." R. 290. Dr. Madsen further stated that Mr. Gaylor could not attend to a simple repetitive task continuously for a two hour period of time and that Mr. Gaylor's current prognosis was poor. R. 293-94.

On November 5, 2001, Dr. Elliot M. Wallack, M.D., a neurologist, evaluated Mr. Gaylor's mental status. He found that Mr. Gaylor had normal memory, concentration, and attention span, as well as normal reflexes and motor strength. R. 517.

On September 16, 2002, Mr. Gaylor began to see a psychiatrist, Dr. David Kennedy, M.D. R. 681-82. Dr. Kennedy diagnosed Mr. Gaylor with depressive syndrome characterized by anhedonia or pervasive loss of interest, appetite disturbance with change in weight, sleep disturbance, psychomotor retardation,

decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking.  R. 656.  Dr. Kennedy asserted that Mr. Gaylor suffered from marked impairment (*i.e.*, impairment of function up to 75 percent of the time), which affected his activities of daily living, social functioning, and concentration.  R. 657.  Dr. Kennedy also stated that Mr. Gaylor had experienced one or two episodes of decompensation lasting for at least two weeks.  R. 657.  His opinion was that the disorder had caused more than a minimal limitation of ability for Mr. Gaylor to do basic work activities or maintain reliable attendance in a work setting.  R. 658.

On November 29, 2004, agency psychologist Dr. Henry G. Martin, Ph.D., examined Mr. Gaylor.  Based on the exam and a Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") Test, Dr. Martin found that Mr. Gaylor had above-average intelligence and mental functioning.  R. 699-700.  Although Dr. Martin found that Mr. Gaylor had chronic anxiety, panic disorders, and social anxiety, Dr. Martin stated that Mr. Gaylor would be able to work in a setting with limited social/public demands.  *Id.*

In a report dated March 14, 2005, Dr. Edward A. Czarnecki, Ph.D., reviewed Dr. Martin's psychological examination of Mr. Gaylor, the MMPI-2, and certain records of Dr. Kennedy.  R. 706.  Dr. Czarnecki wrote that the conclusions of Dr. Martin were "not consistent with the test results or clinical findings," and that "[t]he preponderance of evidence [was] consistent with the attending psychiatrist's opinion."  Dr. Czarnecki concluded that "the claimant does not retain the mental

capacity to sustain an independent routine of even simple work activity" and "could not be expected to behave in a socially appropriate or stable manner with any consistency or reliability." R. 708.

II.   *Testimony at the Hearings*

Mr. Gaylor testified before the ALJ on September 10, 2003, April 20, 2004, and March 31, 2005. On September 10, 2003, he testified that he provided care for one of his sons, whom he described as mostly self-sufficient. Mr. Gaylor testified that his duties were mainly "watching" and occasionally getting "snacks," and that he received varying amounts of help each week from his parents and a niece. R. 730, 744, 767-68. Mr. Gaylor testified that he was able to perform light housework with frequent breaks, watch television, drive, and use a computer. R. 731, 747-50, 767. He also testified that his pain became so intense that for a few hours or days, "I'm pretty much on my back laying [sic] down." R. 732. He further testified that this occurred approximately once or twice a week, lasted between "a couple of hours" and "a few days," and he could not predict when it would happen. R. 733.

On March 31, 2005, the ALJ asked vocational expert Constance Brown whether there were jobs in the local economy available to a hypothetical person of the claimant's age, education, and work experience who could lift and carry 20 pounds occasionally and 10 pounds frequently, and could stand and walk for six hours in an eight hour day, provided that the individual could switch positions

and could avoid serious physical dangers or impediments. In addition, the hypothetical person could perform only simple, repetitive tasks, and could interact with people only superficially. R. 770. Ms. Brown testified that there were thousands of jobs available in the local economy, both for sedentary or light work with the named restrictions. R. 771-72.

III.    *Procedural History*

On November 26, 2001, Mr. Gaylor filed an application for disability insurance benefits. ALJ Albert J. Velasquez issued his decision denying Mr. Gaylor's application for disability benefits on May 28, 2004. Mr. Gaylor appealed the decision of the ALJ to the Appeals Council, which remanded the decision to the ALJ for further consideration of evidence of mental impairments. On August 26, 2005, the ALJ found that Mr. Gaylor had mental disabilities but found that he could work with certain social and mental restrictions. The ALJ incorporated by reference the summary of evidence and findings on physical disability from his May 28, 2004 opinion into his August 26, 2005 opinion.

The Appeals Council denied further review, so the ALJ's decision is treated as the final decision of the Commissioner. See *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). Mr. Gaylor filed a timely petition for judicial review. This court has jurisdiction to review this matter pursuant to 42 U.S.C. § 405(g).

*The Disability Standard*

To be eligible for Social Security disability insurance benefits, Mr. Gaylor must demonstrate that he was unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that had lasted or could be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d). Mr. Gaylor could establish disability only if his impairments were of such severity that he was unable to perform both his previous work and any other substantial work available in the national economy. 20 C.F.R. §§ 404.1520(f) and (g).

This eligibility standard is stringent. Unlike many private disability insurance programs, the Social Security Act does not contemplate degrees of disability and does not allow for an award based on a partial disability. *Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1989). The Act provides important assistance for some of the most disadvantaged members of American society. But before tax dollars – including tax dollars paid by others who work despite serious and painful impairments – are available as disability benefits, it must be clear that the claimant has an impairment severe enough to prevent him from performing virtually any kind of work. Under the statutory standard, these benefits are available only as a matter of nearly last resort.

The implementing regulations for the Act provide the familiar five-step process to evaluate disability. The steps are:

    (1)    Has the claimant engaged in substantial gainful activity?  If so, he was not disabled.

    (2)    If not, did the claimant have an impairment or combination of impairments that are severe?  If not, he was not disabled.

    (3)    If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

    (4)    If not, could the claimant do his past relevant work?  If so, he was not disabled.

    (5)    If not, could the claimant perform other work given his residual functional capacity, age, education, and experience?  If so, then he was not disabled.  If not, he was disabled.

See generally 20 C.F.R. § 404.1520.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

*Standard of Review*

If the Commissioner's decision is both supported by substantial evidence and based on the proper legal criteria, it must be upheld by a reviewing court. 42 U.S.C. § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), citing *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the

evidence, resolving material conflicts, or reconsidering the facts or the credibility of the witnesses. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). The court must examine the evidence that favors the claimant as well as the evidence that supports the Commissioner's conclusion. *Zurawski*, 245 F.3d at 888. Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of the conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). Also, the ALJ must explain the decision with "enough detail and clarity to permit meaningful appellate review." *Briscoe*, 425 F.3d at 351.

*Discussion*

I.   *Mr. Gaylor's Subjective Account of Pain*

The ALJ found that Mr. Gaylor's testimony regarding the severity of his symptoms and functional limitations was not fully credible because it was "not reasonably consistent with the objective medical evidence or other evidence of the record." R. 586. Mr. Gaylor argues that the ALJ did not properly analyze Mr. Gaylor's subjective description of his symptoms.

Social Security Ruling 96-7p describes the two-step analysis that the ALJ must perform in assessing subjective complaints of pain. 20 C.F.R. § 404.1529; SSR 96-7p. First, the ALJ must determine whether "medically determinable physical or mental impairments" exist that could "reasonably be expected to produce the individual's pain or symptoms." § 404.1529; SSR 96-7p. If the ALJ finds that no impairment could reasonably cause the symptoms, then no symptom can be a basis for a finding of disability, no matter how genuine the complaints appear to be. SSR 96-7p. If the ALJ finds "an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain," the ALJ's next step is to "make a specific finding on the credibility of the individual's statements based on a consideration of the entire case record," including the objective medical evidence, daily activities, characteristics of the symptoms, aggravating factors, medications, and treatments. SSR 96-7p; see generally *Golembiewski v. Barnhart*, 322 F.3d 912, 915-16 (7th Cir. 2003).

Ordinarily a reviewing court defers to an ALJ's credibility determination. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Absent legal error, an ALJ's credibility finding will not be disturbed unless "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000); *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). Nevertheless, the ALJ must explain adequately the reasons behind a credibility finding and must provide more than a conclusory statement that a claimant's allegations are not credible. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). The ALJ may not disregard a claimant's subjective complaints

merely because they are not fully supported by objective medical evidence, *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995), but the ALJ may discount subjective complaints that are inconsistent with the evidence as a whole. *Id.*; 20 C.F.R. § 404.1529.

Mr. Gaylor argues that the ALJ failed to perform the first step of analysis described in SSR 96-7p, which requires determining whether there was a medical impairment that could reasonably be expected to produce his pain. The ALJ did, however, perform the second step of analysis – the credibility determination – which would have been unnecessary without a finding in the claimant's favor at the first step.  While the ALJ did not explicitly find whether there was a medical impairment that could reasonably be expected to produce his pain, by moving on to the credibility analysis, the ALJ proceeded in a manner consistent with a finding in Mr. Gaylor's favor.  Also, it would have been perfectly obvious to the ALJ that Mr. Gaylor's extensive history of back problems could reasonably be expected to produce significant pain.  The issue was the severity of that pain.

Mr. Gaylor next argues that the ALJ's credibility finding was not based on substantial evidence in the record.  The ALJ did not simply conclude that Mr. Gaylor was not credible.  He considered several factors in making his credibility finding.  First, the ALJ discussed the medical evidence and found that it did not support Mr. Gaylor's claim of disabling pain. The ALJ cited doctors' opinions that there was no muscle atrophy, weakness, loss of reflexes, neurological deficits,

nerve root damage, or spinal cord damage. Dr. Trammell and Dr. Coscia reported that the fusion surgeries showed no evidence of complications. Dr. Coscia further stated that the physical symptoms were not sufficient to justify long-term disability, and that he planned to release Mr. Gaylor back to work.

Second, the ALJ discussed treating doctors' opinions on the extent of Mr. Gaylor's pain. Dr. McLimore and Dr. Trammell stated that Mr. Gaylor appeared to be less disabled by pain than he alleged. Several doctors felt that Mr. Gaylor should be weaned off of narcotics, from which the ALJ concluded "they do not believe his symptoms are of the severity which requires such medication." R. 586. The ALJ further concluded that Mr. Gaylor's behavior was more consistent with drug-seeking behavior than disabling pain, noting that Mr. Gaylor repeatedly had transferred his care to a new doctor when he was placed on wean schedules, and that Dr. McLimore suggested the possibility of inpatient detoxification treatment.

Finally, the ALJ examined Mr. Gaylor's daily activities. The ALJ noted that despite getting help from a family member, Mr. Gaylor "is the primary care giver for his two children when his wife is at work" and reported walking over a mile a day. R. 587. The ALJ noted that Mr. Gaylor used a computer, read, fixed simple meals, played with his children, changed diapers, drove his car, watched television, carried his two-year-old son to bed, showered independently, and took care of the pet dog. *Id.* The ALJ concluded that Mr. Gaylor's daily activities were

inconsistent with his testimony on the frequency and severity of the symptoms. *Id.*

In making the credibility determination, the ALJ considered the relevant factors, articulated his reasoning, and ultimately concluded that Mr. Gaylor was not as limited as he alleged. This court does not have the duty or the power to reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). The court cannot conclude that the ALJ's credibility determination was patently wrong. His determination must stand.

II.   *Treating Physician's Opinions*

Mr. Gaylor also argues that the ALJ erred by failing to credit three treating physicians' opinions that he would have problems with reliable attendance at a work setting. A treating physician's opinion regarding the nature and severity of a claimant's medical condition is entitled to controlling weight if well-supported by medically acceptable techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). An ALJ may discount a treating source's opinion if it is inconsistent with the opinion of a consulting physician or if the treating source's opinion is internally inconsistent, as long as the ALJ "minimally articulates his reasons for crediting or rejecting evidence of disability." *Skarbek*, 390 F.3d at 503, citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *Knight v. Chater*, 55 F.3d

309, 314 (7th Cir. 1995) (finding physician's opinion "may be discounted if it is internally inconsistent").

### A. *Dr. Kennedy's Opinion as to Mental Disability*

Dr. Kennedy, Mr. Gaylor's treating psychiatrist, stated that his psychological impairments would interfere with his ability to maintain reliable attendance at a job. R. 658. The ALJ found that Dr. Kennedy's opinion was inconsistent with the weight of evidence and concluded that Mr. Gaylor could work in a setting with limited social or public demands. R. 22.

In reaching this conclusion, the ALJ adequately discussed each relevant piece of evidence. The ALJ noted that Dr. Martin contradicted Dr. Kennedy's evaluation and opined that, although Mr. Gaylor suffered from chronic anxiety and depression, he would be able to work in a setting with limited social or public demands. R. 22-25, 699. The ALJ also cited Mr. Gaylor's daily activities, interests, appearance, mental awareness, self-sufficiency, family relationships, and ability to function mentally at prior jobs as further evidence that contradicted Dr. Kennedy's opinion. R. 22.

The evidence allows reasonable minds to differ as to Mr. Gaylor's mental limitations. The ALJ adequately explained his reasons for discounting Dr. Kennedy's opinion. The court must defer to the ALJ's reasoned resolution of the conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

B.   *Dr. Green-Mack's and Dr. Heathers' Opinions on Physical Disability*

The ALJ also found Mr. Gaylor could perform light work with restrictions despite Dr. Green-Mack's opinion that physical disabilities would interfere with Mr. Gaylor's ability to maintain reliable attendance in a work setting, and Dr. Heather's opinion that Mr. Gaylor would be able to work only three days per week. R. 497, 566-67, 589. The ALJ concluded that their opinions should not be given controlling weight because they were not supported by objective medical evidence and were inconsistent with other evidence on the record.

As support for this conclusion, the ALJ pointed to several pieces of evidence also cited in his credibility determination. The ALJ wrote that Dr. Coscia, another treating physician, disagreed with Dr. Green-Mack's and Dr. Heathers' opinions. As previously discussed, Dr. Coscia felt that he could not find evidence of physical problems that justified long-term disability, so he planned to release Mr. Gaylor back to work. The ALJ also found, as discussed above, that neither the medical evidence nor Mr. Gaylor's daily activities supported a conclusion that Mr. Gaylor was too disabled to work with the stated restrictions.

The evidence allows reasonable minds to differ as to Mr. Gaylor's capacity for reliable attendance at work. Because the ALJ adequately explained his reasons for discounting Dr. Green-Mack's and Dr. Heathers' opinions, the court again must defer to the Commissioner's resolution of the conflict. *Binion*, 108 F.3d at 782.

III.     *Residual Functional Capacity*

Mr. Gaylor also argues that the ALJ's finding on his residual functional capacity did not consider his impairments in combination. The ALJ was well aware of Mr. Gaylor's physical and mental impairments when making his findings. First, the ALJ posed a hypothetical question to the vocational expert that contained not only physical restrictions but also mental and social restrictions, including that the "work should be simple and repetitive in nature with no more than superficial interaction with the general public, co-workers or supervisors." Second, the ALJ's August 5, 2005 decision stated that he considered the mental and physical impairments "both individually and in combination." R. 19. Third, his findings on Mr. Gaylor's disabilities included both severe degenerative disc disease and severe depression. R. 24. Finally, the ALJ found that Mr. Gaylor's residual functional capacity required physical, social, and mental restrictions on available work, showing that the ALJ clearly considered more than merely physical impairments. *Id.* In sum, the record indicates that the ALJ considered Mr. Gaylor's mental and physical impairments both individually and in combination when determining that he RFC did not qualify him for Social Security disability insurance benefits.

*Conclusion*

For the foregoing reasons, the ALJ's decision denying benefits is supported by substantial evidence and does not reflect a legal error that would require

remand. Accordingly, the decision is affirmed. Final judgment will be entered accordingly.

So ordered.

Date: March 16, 2007

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Daniel Leonard Pulter
WORMAN DIXON & MANIS PLC
dan@wdmplc.com